UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MARGALIE RODRIGUEZ,

                              Plaintiff,

                                                    **COMPLAINT**
                                                    **PLAINTIFF DEMANDS A**
                                                    **TRIAL BY JURY**


v

NASSAU COUNTY and
NASSAU COUNTY COMMISSION
ON HUMAN RIGHTS,


                    Defendants.
-------------------------------------------------------------X

Plaintiff, Margalie Rodriguez, through her counsel, DEREK SMITH LAW GROUP PLLC, hereby complains of the Defendants, upon information and belief, as follows:

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII"), 42 U.S.C. § 1981, New York State Human Rights Law, and seeks damages to redress the injuries Plaintiff suffered as a result of being exposed to sex/gender discrimination, national origin discrimination, race/color discrimination, hostile work environment, failure to promote and opposed discrimination/retaliation.

2. Jurisdiction of this action is conferred upon this Court as this action involves a federal question under Title VII of the Civil Rights Act. The Court also has supplemental jurisdiction over the State Causes of Action.

3. Plaintiff filed a verified Complaint with the New York State Division of Human Rights May 8, 2015.

4. On March 4, 2016, the EEOC mailed to Plaintiff a Right to Sue Letter.

5. Plaintiff completed all of her administrative prerequisites and filed her complaint within 90 days of receipt of the Right to Sue Letter.

## FACTS

6. Plaintiff MARGALIE RODRIGUEZ is a Black female residing in the State of New York, County of Nassau.

7. At all times relevant, Plaintiff is employed by Defendant Nassau County within the Nassau County Commission on Human Rights as a Human Relations Representative.

8. Defendant Nassau County is a municipal corporation duly formed by the State of New York law.

9. Plaintiff, along with two other individuals, Daniel Russell (herein after also referred to as "RUSSELL") and Rodney McRae (herein after also referred to as "MCRAE"), were hired on a provisional basis.

10. Defendant Nassau County Commission on Human Rights is a county law enforcement agency which enforces the federal, New York State and Nassau County Human Rights Laws.

11. Plaintiff was immediately assigned as investigator in the Investigation and Compliance Unit, due to her many years of experience as a human rights advocate.

12. Defendants assigned RUSSELL to the Job Development Unit, and MCRAE to the Pre-Trial Unit.

13. Shortly thereafter, CSEA required the employees to take the civil service exam for

them to remain employed in their positions.

14. Around 1995, RUSSELL, MCRAE and Plaintiff took the civil service test.

15. RUSSELL and Plaintiff passed and scored within the first place.

16. Both employees were appointed permanently in their positions.

17. MCRAE did not score high enough to remain in his position, and was placed in another position provisionally.

18. Around 1997, Defendants promoted Plaintiff to Human Relations Representative II, a supervisory position.

19. Defendants moved MCRAE to Plaintiff's former Human Relations Representative I position, provisionally.

20. Shortly thereafter, CSEA required Plaintiff and MCRAE to both take the prospective exams to remain employed in their positions.

21. Once more, Plaintiff passed with the highest score for the Human Relations Representative II exam.

22. Plaintiff later learned that MCRAE passed with a score to attain the Human Relations Representative I title permanently. MCRAE held this position until January 2015.

23. Around 1998, Plaintiff's job responsibilities increased as Civil Service of Human Relations Representative II.

24. As an attorney, Plaintiff supervises the Investigations and Compliance Unit which includes the instigation of discrimination complaints filed against Nassau county residents under the County, State, and federal human rights laws. Plaintiff plans and coordinates the Commission's procedures, laws, rules and assists the Executive Director with the Commission's programs, events and activities. Plaintiff writes final

investigations reports, memorandum of law, legal recommendations, final decisions, settlement agreements, conciliation agreement. Plaintiff presides over hearings and conferences. She conducts training for staffs. Plaintiff engages in speaking assignments to community organizations, schools, businesses, human rights local groups, civil organizations, churches, etc. Plaintiff assists Defendants' employers in drafting and formulating employment policies and procedures. Plaintiff works with Defendant Nassau County Attorney Office and other county agencies to write and amend the Nassau County Human Rights Laws. Plaintiff represents Nassau County at different events, functions, and programs. In the absence of the Executive Director, Plaintiff is next in command in title and functions. Plaintiff performs several other related duties, such as she is the FOIL Representative, the EEO Representative, and the contact person to several other agencies.

25. When Plaintiff was hired, James Rice (herein after also referred to as "RICE") was the Executive Director of the Commission.

26. RICE was not an attorney, and the Commission did not employ any other attorney.

27. Many of the Executive Director functions required one to be an attorney, the Commission was assigned a deputy County Attorney to make many of the legal decisions and to render any legal advice.

28. Around 2000, RICE retired and Renaire Frierson, Esq. (herein after also referred to as "FRIERSON") became Acting Executive Director of the Commission. Since FRIERSON is an attorney, there was no need for a Deputy County Attorney to be assigned to the Commission.

29. Around 2001, Plaintiff became a New York State licensed attorney.

4

30. Around 2008, RUSSELL replaced FRIERSON as Executive Director. RUSSELL is not an attorney.

31. Although Plaintiff is an attorney and second in command in the Commission, Defendants did not consider Plaintiff for the position.

32. Around 2008, Zahid Syed (herein after also referred to as "SYED"), who is Pakistani, became a Commissioner of the Commission.

33. Around 2010, SYED was promoted to Chairman of the Commission.

34. Shortly after becoming Chairman of the Commission, SYED began to change the mandates of the Commission.

35. Plaintiff had multiple discussions with RUSSELL regarding that they had a duty to not allow SYED to influence them in the integrity of the important work they had to do.

36. Regularly, SYED would treat Plaintiff differently than he treated the male employees.

37. Plaintiff shared her concerns with RUSSELL, he often assured Plaintiff that the Commission would continue to do its work in spite of SYED'S discriminatory behavior.

38. During Plaintiff's employment, the Commission held a summer employment program. The program employed youths from Nassau County who met the income requirements. Most of these youths were members of the minority races and their families greatly depended upon that income to help meet the students' educational needs.

39. Furthermore, the summer employment program helped keep Nassau County youths

off the streets and provided them with useful skills to aid them in becoming productive members of society. The funding for summer employment program came from the funds that the Nassau County received from the Federal Community Development Block Grant (CDBG) programs.

40. Around the time SYED became Chairman of the Commission, he also became an employee of the Nassau county government.

41. The Chairman of the Commission is a non-paid position.

42. However, SYED became a big monetary contributor to the current administration and a paid employee of the Nassau county government.

43. During the same time, the Commission became unable to continue the summer employment program. Employees were told that the federal funds were being used to pay SYED's salary as an employee of Nassau County. This was a violation of county rules and policies.

44. SYED salary was being paid from funds that the federal government gives to Nassau County to assist in housing and community development programs.

45. SYED actions as a political contributor did not qualify for such purpose. This view was raised and confirmed after several investigations conducted by sources including the Newsday newspaper. Newday printed articles regarding these issues on March 10, 2014, July 21, 23, 28, 2014 and October 9 and 23, 2014.

46. Around December 2014, RUSSELL informed Defendants that he would retire. In Plaintiff's presence, RUSSELL called SYED, and recommended Plaintiff for the Executive Director position.

47. Based on the bylaws of the Commission, the Board of Commissioners recommends a

prospective candidate to the County Executive after a thorough search and extensive interview for the position of the Executive Director position.

48. In Plaintiff's presence, RUSSELL told SYED that he believed that Plaintiff was best suited for the position because she was already executing most of the tasks relating to leading the Commission.

49. Russell instructed Plaintiff to call SYED to schedule and interview and submit her resume and biography to SYED.

50. Immediately that same day, PLAINTFF did as instructed and met with SYED at his office within the Town of Hempstead.

51. During the interview, they discussed Plaintiff's great interest in the position and how she would improve the services provided to the Nassau County residents.

52. However, during the interview, SYED was not engaged with or towards Plaintiff.

53. Defendants' employee SYED repeatedly reminded Plaintiff how powerful he was in the County and that he controlled the Commission. SYED bragged that he had the ears of the County Executive in all matters.

54. SYED proceeded to belittle Plaintiff as a woman and reminded her that he was aware of her views regarding his position in the Commission.

55. SYED told Plaintiff that the Commission would continue to be in his control and that he wishes to hire several male employees who share his views.

56. Plaintiff reminded SYED that any employees he hired would have to meet the Civil Service rules and be qualified for the position.

57. SYED again reminded Plaintiff that he was not worried about that because he controls Nassau County.

58. SYED went further to remind Plaintiff that he has great influence in the Pakistani and Indian communities and that he would soon hire employees within those communities only.

59. SYED's threats were made to intimidate and belittle Plaintiff.

60. Prior to this interview, Plaintiff voiced to RUSSELL, MCRAE and employees of the Nassau County Attorney's Office that SYED should not be the Chairman of the Commission due to his discriminatory views and the influence his views had on the Commission.

61. Following Plaintiff's interview with SYED in December 2014, Plaintiff sent SYED several emails and voice messages to inquire the status of the Executive Director position.

62. SYED failed to call or reply to Plaintiff's many attempts to contact him.

63. Around December 2014, Darrell Garner, who is a male, (herein after also referred to as "GARNER") received a hefty promotion.

64. GARNER was hired about four years prior, as a Community Service Representative.

65. At the time, Defendant failed to give Plaintiff such a raise.

66. GARNER did not perform any functions in the Commission other than presenting citations at different functions on behalf of the County Executive.

67. Around late December 2014, SYED instructed Christine Kuch, (herein after also referred to as "KUCH"), the secretary of the Commission to send an email to all employees informing everyone that MCRAE was appointed as the interim Executive Director. This was done without official action of the other Commissioners.

68. SYED's action shocked and amazed Plaintiff.

69.  During Plaintiff's twenty years working with MCRAE, he never held a supervisory position with the Commission. MCRAE worked in the Pre-Trial Unit for several years. Court documents and correctional attendance sheets would confirm that MCRAE ceased to provide any services to the inmates in the Nassau County Correctional Facility.

70.  Furthermore, MCRAE few tasks related to the Commission's daily work. In large part, historically MCRAE performed tasks related to the annual MLK Luncheon celebration.

71.  MCRAE was not more qualified than Plaintiff for the promotion. Defendants offered MCRAE the promotion Plaintiff earned because MCRAE is a male.

72.  Upon seeing the state of affairs in the Commission and SYED bypassing the Board to appoint MCRAE, Plaintiff spoke to MCRAE about SYED's decision to over pass her for the position because her gender and other discriminatory reasons. Plaintiff further informed MCRAE that in the interest of peace and in the interest of the Commission, Plaintiff would accept the Deputy Director position in order to continue to perform all duties in enforcing the human rights laws.

73.  MCRAE replied "ok."

74.  MCRAE requested Plaintiff to give him a memo with Plaintiff requesting to take a leave of absence from her current position to be appointed the Deputy Director position.

75.  MCRAE further informed Plaintiff that he could not appoint Plaintiff himself and that Plaintiff should direct the memo to Rob Walker, (herein after also referred to as "WALKER"), Chief Deputy County Executive.

76. Plaintiff did as directed by MCRAE, and immediately gave the memo to MCRAE and to WALKER.

77. Around February 2015, Plaintiff asked MCRAE about the status of the Deputy Director position. MCRAE informed Plaintiff to speak to SYED.

78. Once again, Plaintiff emailed SYED.

79. SYED never replied to Plaintiff.

80. Around January 2015, Plaintiff came across a document in the office that SYED had KUCH type changing the entire formation of the board of the Nassau County Anti-Bias Task Force, appointing MCRAE and Sheryar Coudhry (herein after also referred to as "COUDHRY") as Directors of the Board. Such action required a vote, as per its bylaws.

81. Plaintiff became alarmed since the Task Force is comprised of a board for which Plaintiff was a Deputy Director and Chair of the Membership Committee.

82. No one other than SYED, MCRAE and CHOUDHRY were aware of these changes in the Task Force.

83. Plaintiff emailed and called Legislator Francis X. Becker, (herein after also referred to as "BECKER"), Co-Chair of the Task Force to discuss SYED's behavior in the Task Force and in the Commission.

84. Legislator BECKER never called to schedule a meeting with Plaintiff.

85. BECKER is Plaintiff's Legislator that represents her local district.

86. Around January 2015, Plaintiff spoke to Deputy County Attorney Robert Van Der Waag (herein after also referred to as "VAN DER WAAG") about all the issues and concerns about the Commission. During this call, Plaintiff and VAN DER WAAG

also discussed the legal liabilities that SYED was exposing the County to through his unilateral actions, decisions and acts of discrimination.

87. VAN DER WAAG told Plaintiff he would speak with County Attorney FOSKEY to further discuss the issues.

88. A few weeks after, VAN DER WAAG, called Plaintiff and said both him and Judge FOSKEY suggested that Plaintiff write a letter to County Executive with her concerns and issues. VAN DER WAGG also instructed Plaintiff to "cc" the County Attorney in the correspondence.

89. On around March 4, 2015, Plaintiff emailed a letter to County Executive Mangano, (herein after also referred to as "DER WAAG.

90. MANGANO"), WALKER, FOSKEY, and VAN Plaintiff also sent the same letter to Immacula Oligario (herein after also referred to as "OLIGARIO"), who is a female Commissioner of the Commission.

91. OLIGARIO forwarded Plaintiff's letter to all of the commissioners, informing them of Plaintiff's issues raised in her letter.

92. Days later, OLIGARIO invited Plaintiff to the Commissioner meeting on March 23, 2015, to further discuss Plaintiff's ongoing complaints of discrimination.

93. On or around March 23, 2015, Plaintiff appeared at the Commission meeting. Before Plaintiff could be heard or any business was conducted, SYED informed Plaintiff that her presence at the meeting was not necessary. SYED told Plaintiff she should leave and wait for the County Attorney to contact her.

94. After being summarily dismissed, Plaintiff left immediately.

95. Within days of this meeting, MCRAE began to treat Plaintiff differently by keeping

11

her out of meeting and removing some key functions from her. MCRAE failed to engage with Plaintiff in the business of the Commission as had been the prior practice, which created a hostile work environment.

96. In March 2015, at the advice of a former Nassau County employee who worked closely with the County Executive, Plaintiff called and emailed Reverend Philip Elliott (herein after also referred to as "ELLIOTT"), Executive Director of Nassau county Minority Affairs Office, to bring the issues to him. ELLIOTT is also a Deputy County Executive, and the Commission falls under his "umbrella."

97. ELLIOTT never called or replied to Plaintiff.

98. Plaintiff became concerned that ELLIOTT would not help because of his alliance with MCRAE.

99. ELLIOT and SYED made the decision to appoint MCRAE as Executive Director of the Commission.

100. Plaintiff's reluctance to seek ELLIOTT'S assistance in this matter was on the fact that under his command, the Office of Minority Affairs had failed to assist any female-owned businesses in the Nassau County. Such finding was made in a report published by Nassau County agencies

101. Therefore, it was no surprise when ELLIOTT appeared for the first time at MCRAE'S first staff meeting on March 20, 2015. ELLIOTT'S appearance was to intimidate Plaintiff and to let her know that he was aware of Plaintiff's complaint and that MCRAE had ELLIOTT'S full support. ELLIOTT never attended any of the previous staff meetings. MCRAE allowed the intimidation and fostered the situation.

102. The intimidation enhanced the hostile work environment for Plaintiff.

12

103. On or about March 3, 2015, during a meeting with the Housing and community Development to discuss the federal grants to Nassau County, Plaintiff was informed that the upcoming meeting to discuss the recipients of the 2015 would be on May 5, 2015. Every year RUSSELL asked Plaintiff to attend these meetings.

104. MCRAE requested that Plaintiff not be included in these meetings because of her pending discrimination complaint.

105. Plaintiff was not asked to attend the meeting. Plaintiff learned that MCRAE and SYED asked for Plaintiff not to be included in any Commission functions.

106. Plaintiff had to be updated by the staff on what is happening in the Commission.

107. Plaintiff was informed that MCRAE asked the investigative staff not to report to Plaintiff anymore.

108. The investigative staff does not speak to Plaintiff, in fear of being retaliated by MCRAE.

109. In late April 2015, the Office of the Legislative Budget Review published a report confirming that women are not receiving the same type of services as their male counterparts because of their sex. The same report illustrated other discriminatory wrongdoings by the county.

110. This retaliatory    act neglectively impacted Plaintiff's job.

111. It is difficult for Plaintiff to know that she is being mistreated, and have been passed over due to her gender. Yet, Plaintiff continues to do her work, in spite of the hostile work environment.

112. On or about April 6, 2015, Plaintiff received a personal email which contained privileged information and information regarding the annual housing training and

13

conference that the New York State Division on Human Rights held every year.

113.  For 2015, the conference was scheduled for April 21, 2015, in the main office in the Bronx.

114.  Plaintiff emailed the contact person at the State Division requesting their permission for the Commission staff to attend. This has always been the practice during her employment. Upon obtaining approval of the State Division for the Commission to attend, Plaintiff sent an email to MCRAE, asking his permission for the staff to attend.

115.  MCRAE informed Plaintiff that he would not allow the staff to attend unless Plaintiff produced to him the invitation for the event.

116.  MCRAE has been employed with the Commission for over 20 years and has previously shown no interest in learning any investigative procedure of the Commission.

117.  Furthermore, the County has informed Plaintiff that due to lack of funds, they cannot afford to pay for any trainings.

118.  Given the need for this training and the fact that housing complaints are rising in Plaintiff's office, Plaintiff was appalled that MCRAE would not allow the staff to attend the training on April 21, 2015, as they always obtain useful investigative tools and information about housing laws.

119.  Defendants' act was another contributing factor to making the workplace hostile for Plaintiff.

120.  Defendants' behavior further displays that MCRAE does not possess the qualifications, knowledge and skills to be Executive Director of the Commission.

121.  MCRAE'S lack of skills and knowledge is displayed in his refusal to attend any trainings and seminars to learn about the human rights laws and procedures.

122.  MCRAE refused to familiarize himself with any cases in the Commission.

123.  All of those responsibilities have been transferred to the Plaintiff because of MCRAE'S lack of skills and knowledge.

124.  MCRAE turned down the invitation to all the trainings and seminars offered to him to enhance his skills and knowledge as Executive Director because those functions are being performed by the Plaintiff, although she was passed over for the position as Executive Director because of her race, color, national origin and gender/sex.

125.  Defendants actively recruited males for any vacant position in the Commission.

126.  Furthermore, Defendants hired only males to fill in all executive positions.

127.  Based on information and belief, FRIERSON, who was the only female Executive Director of the Commission, filed a discrimination lawsuit against the Defendants because her dismissal was because of her gender and other discriminatory bases.

128.  Defendants are pushing Plaintiff and trying to force her to resign from her position because Plaintiff opposed the discriminatory actions taken, subjecting her to this treatment because of national origin and gender/sex.

129.  On or Around April 2015, Plaintiff along with the investigative staff submitted their monthly mileage report to MCRAE for his approval for payment.

130.  MCRAE immediately approved the mileage for the other staff members, and denied that of the Plaintiff.

131.  To date, Plaintiff has not received payment for the mileage.

132.  Plaintiff is a highly dedicated worker and works over forty (40) hours a week on a

regular basis.

133. Plaintiff's position is non-exempt.

134. Plaintiff has not received compensation for any overtime she worked since MCRAE took over as Executive Director.

135. In fact, Defendants denied Plaintiff overtime continuously for the last year.

136. Prior to Plaintiff's complaint against Defendants, Plaintiff was invited to events, programs and functions.

137. As a result of Defendants' actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

138. Plaintiff is currently in therapy to deal with the emotional distress caused by Defendants.

139. As a result of Defendants' discriminatory and intolerable treatment, Plaintiff suffered and continues to suffer severe emotional distress.

140. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

141. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages against Defendants. The above are just some of the examples of unlawful and discriminatory conduct to which Defendants subjected Plaintiff.

142. Defendants have a pattern and practice of discrimination.

143.  The above are just some of the examples of unlawful conduct to which Defendants subjected Plaintiff to on an ongoing continuous basis.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII

144. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

145. Title VII states in relevant part as follows: SEC. 2000e-2. [Section 703] (a) Employer Practices; it shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to her/his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

146. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of her gender/sex, national origin and race.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII

147. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

148. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because [s]he has   opposed          any

17

practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

149. Defendants engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e *et seq*. by retaliating against Plaintiff with respect to the terms, conditions or privilege of employment because of her opposition to the unlawful employment practices of Defendants.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

150. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

151. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

152. Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her gender/sex, national origin and race.

153. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Executive Law Section 296.

<u>**AS A FOURTH CAUSE OF ACTION**</u>
<u>**FOR DISCRIMINATION UNDER STATE LAW**</u>

154. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

155.  New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

156. Defendants engaged in an unlawful discriminatory practice by wrongfully retaliating against Plaintiff.

<u>**AS A FIFTH CAUSE OF ACTION**</u>
<u>**FOR DISCRIMINATION UNDER STATE LAW**</u>

157. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

158. New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

159. Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding and abetting, inciting, compelling and coercing the discriminatory conduct.

<u>**AS A SIXTH CAUSE OF ACTION**</u>
<u>**DISCRIMINATION AND RETALIATION**</u>
<u>**IN VIOLATION OF 42 U.S.C. § 1981**</u>

160.  Plaintiff repeats and realleges by this reference the allegations set forth in the above

19

paragraphs of this complaint.

161. Section 1981 states as follows, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

162. The section further states that "For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

163. Defendants' discrimination against Plaintiff is in violation of the rights of Plaintiff as afforded to her by the Civil Right Act of 1866, 42 U.S.C. 1981.

164. By the conduct described above, Defendants intentionally deprived the Plaintiff an African American of the same rights as are enjoyed by White citizens to the creation, performance, enjoyment, and all benefits and privileges of her contractual employment relationship with Defendants.

165. As a result of Defendants' discrimination in violation of Section 1981, Plaintiff has been denied employment opportunities providing substantial compensation and benefits, thereby entitling her to injunctive and equitable monetary relief; and have suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling her to compensatory damages.

166. Defendants acted with malice or reckless indifference to the rights of the

above-named African American thereby entitling her to an award of punitive damages.

167. To remedy the violations of the rights of Plaintiff secured by Section 1981, Plaintiff requests that the Court award her the relief prayed for below.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff demands judgment against Defendants in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated:   New York, New York
         May 24, 2016

DEREK SMITH LAW GROUP PLLC

By: _____

    John C. Luke, Jr., Esq.
    30 Broad Street, 35th Floor
    New York, New York 10004
    Tel. (212) 587-0760
    Fax. (212) 587-4169
    *Attorneys for Plaintiff*